#1
E-FILED
Monday, 16 October, 2006  11:32:50 AM
Clerk, U.S. District Court, ILCD

RECEIVED

OCT 11 REC'D

U.S. CLERK'S OFFICE
SPRINGFIELD, ILLINOIS

Sherrie Paulette Renken
#14433-026/A2 Valley Unit
Docket Number   04-30066-01
Seventh Central District Illinois
Federal Prison Camp
Box A
Alderson, WV 24910-0990
September 30, 2006
1-304-445-3300

TO:
Honorable Jeanne E. Scott – District Judge
151 Federal Bldg.
600 E Monroe Street
Springfield, IL. 62701
1-217-492-4000

RE: Home Confinement / Halfway House Request
       Per PS 7310.04 and 18 USC 3621(b) how-
ever I have no knowledge of the Law and I am unable to pay a Lawyer.
To whom it May Concern,

I am a first time offender currently incarcerated
at Alderson Federal Prison Camp for Women, Alderson,
West Virginia on a non-violent white collar crime. I
have served 8 months and have 8½ more months
remaining on my 18 month Sentence.

I am hereby requesting that the remainder

of my sentence be immediately spent in Home Confinement / Halfway House due to extoradornary extenuating circumstances and hardships.

I have never been in trouble before and I feel I am an excellent canidate for this opportunity.

My being incarcerated has been a setback in the progress of my health and wellness.

My incarceration has also caused a great financial hardship on my family as my husband is responsible for taking care of everything including the entire household and household expenses, caring for our two small children, overseeing the supervision of my mentally handicapped sister as well as my mothers estate since her passing on July 3, 2006. My family was unable to afford me the opportunity to be with my mother before or after her passing, even though my mothers final wish was to see me before she passed away.

I have also not been able to see my husband or two small children since February 6, 2006, the day I self surrendered at Alderson.

Federal Prison Camp because of the extreme distance and financial hardship.

Upon being granted the opportunity of being released to home confinement I will beable to be a productive wage earning, tax paying citizen, mother, wife and care giver.

I have a job waiting for me at Hilton Reservation Telecommunication Center near my home starting out as a telecommunication representative with the opportunity of advancement and wage increases. I will also be in the position of obtaining health insurance for my entire family which my husband is unable to afford. I have access to transportation so I will be able to get back and forth to work. With my employment at Hilton, I will be in the position to further my education with the various management programs and courses they offer their employees. I will also be in the position to take my responsibilty and make monthly payments on my restitution.

Since the first day of my incarceration I have maintained a perfect record. I believe it would be in the best interest

#4

of all concerned for me to spend the remainder of my sentence at home taking care of my family, working, paying taxes and paying my restitution.

I thank you in advance for your consideration with my request, and due to the short time I have left and the extreme hardships my family and I are induring, I appreciate you responding in an expedicious manner.

Respectively submitted,

Mrs. Sherrie Paulette Renken

Sherrie Paulette Renken

# INMATE

# DTH BULLETIN

## Residential Reentry Center (RRC)
## Placements

Pre-release programming RRC placements are no longer limited to the last 10% of the prison sentence being served.  This meaning, RRC placements for inmates will not be limited to the last 10% of the prison sentence being served.  This is a result of the Fults v. Sanders 8th Circuit Court decision.

Therefore, as a result of this decision, the BOP has returned to its old policy (PS 7310.04) and will be considering the five factors under 18 USC 3621(b) when making RRC determinations.  Under that policy, placement beyond 180 days is highly unusual, unless there are extraordinary circumstances.

Each inmate, regardless if they specifically request reconsideration, will be reconsidered under the "Fults v. Sanders" factors"; however, inmates will be systematically reviewed in accordance with their release date  (i.e. if an inmate has a 2012 release date, he will not be reviewed for RRC placement, absent extraordinary circumstances, until the last 11-13 months of his sentence).

If an inmate believes he has extraordinary circumstances which would warrant consideration for more than 180 days RRC placement, he may request consideration at any time through his Unit Team.  Any questions should be directed to your Case Manager during open house hours.

Inmates should utilize the Administrative Remedy Program for complaints relating to their RRC determinations by their Unit Team.

R. L. Morrison, Warden

July 27, 2006

background... Federal prison ... limit inmates placement, ... agency ... confinement to the total 6 percent of the prisoner's total sentence or six months.

In Woodall (3rd cir. 2005 F.3d 235) Becker, Circuit Judge, held that: 1) Claim was cognizable on habeas review; 2) statute governing placement by BOP of prisoners in prerelease custody did not authorize BOP regulations limiting placement in community confinement; 3) enumerated factors in BOP statute governing placement in prerelease custody were mandatory; 4) purpose of statute governing placement of prisoners in prerelease custody was to require consideration of individualized circumstances for each prisoner; and 5) prisoner should be placed in community confinement for last six months of his sentence, without regard to invalid regulating.

In Woodwall, Becker opined about CCC's. Becker said, "the criteria for determining CCC placement are instrumental in determining how a sentence will be 'executed'. CCC's and similar facilities, unlike other forms of incarceration are part of the phase of the corrections process focused on re-integrating an inmate into society. The relevant statute specifically provides that a prisoner should be placed in a CCC or similar institution at the end of a prison sentence to "afford the prisoner a reasonable opportunity to adjust to and prepare for...reentry into the community." 18 USC SS3624. CCC's thus satisfy different goals from other types of confinement. We have noted that relatively lenient policies of CCC's as compared to more traditional correctional facilities. CCC pre-release programs often include an employment component under which a prisoner may leave on a daily basis to work in the community. Inmates may be eligible for weekend passes, overnight passes, or furlough." See US v Hellstrom, 988 F2d 448 (3rd cir. 1993); see also US v Latimer 991 F2d 1509. 1513 (9th cir. 1993) (emphasizing that community confinement is "qualitatively different" from confinement at a traditional prison."

Also included in the Woodall decision (emphasis added), describes "the BOP's obligation to prepare prisoners for community reentry by, inter alia, placing them in community confinement. The BOP may not categorically remove its ability to consider the explicit factors set forth by congress in 18 USC SS3621(b) factors."

Evans v Willingham 413 F Supp 2d 155 (D. Conn 2006) The District Court, Underhill J., held that BOP regulation, under which BOP generally will designate inmates to community corrections centers only as part of pre-release custody and programming during the last ten percent of prison sentence being served, not to exceed six months, was invalid. The court also held invalid 28 CFR SS 570.20, and 570.21(a).

In principle. Evans seeks - not release from custody - but an order, directing the Warden to consider her for transfer to a community corrections center (CCC) and enjoining the BOP from applying 28 CFR SS 570.20-.21. That rule, promulgated in 2005, excludes from consideration fro transfers to CCC's any prisoner with more than ten per cent or six months or her sentence remaining. Because the BOP rule is an invalid interpretation of the BOP's authorizing statute, 18 USC SS 3621(b). Woodall states, "the regulations are invalid because the BOP may not categorically remove its ability to consider the explicit factors set forth by Congress in Section 3621(b) for making placement and transfer determinations.

In Fults v Sanders (8th Cir. 2006 F.3d 1088) the Court of Appeals, Malloy, Circuit Judge, held that statutes governing placement by the BOP of prisoners in prerelease custody did not authorize BOP regulations limiting placement in community confinement. The court also held invalid 28 CFR SSSS 570.20 and 570.21.

The 2nd Circuit Court in Levine v. Apker (2nd Cir. 2006 F.5 2590) holds that the BOP exceeded its statutory authority when it promulgated a February 2005 rule categorically limiting the amount of time that a defendant can serve at a half way house to a maximum.. the circuit upholds, tha BOP must consider the statutorily listed factors (e.g. the resources of the facility, the nature of the offense, and the history and characteristics of the offender) before determining whether a particular form of confinement is appropriate and for what period of time. The Court joins the Third and Eighth Circuits in invalidating th BOP regulation.

Pre release programming CCC placement are no longer needed to the last ten per cent of th prison sentence being served. Of course, with this ruling, CCC Placement for inmates will not be limited to the last ten per cent of th prison sentence being served. Therefore, as a result of this decision, the BOP has returned to its old policy (PS 7310.04) and pursuant to that policy, prisoners would request 180 days of halfway house or home confinement that is required of the BOP per PS 7310.04.

According to BOP policy statement 7310.04, CCC's provide an excellent transitional environment for inmates nearing the end of their sentences. The level of structure an supervision assures accountability and program opportunities in employment counseling and placement, substance abuse and daily life skills.

One reason for referring an inmate to a CCC is to increase public protection by aiding the transition of the offender into the community. Participating in community-based transitional services may reduce the likelihood of an inmate with limited resources from recidivating. Whereas, an inmate who is released directly from the institution to the community may return to a criminal lifestyle. While clearly dangerous inmates should be separated from the community until the completion of their sentences, other eligible inmates should generally be referred to CCC's to maximize the chances to successfully re-integrating into society.

In conclusion, the 2nd, 3rd and 8th Circuit Court have held the statute governing placement by the BOP of prisoners in prerelease custody did not authorize BOP regulations limiting placement in Community Confinement. The enumerated factors in BOP statute governing placement in prerelease custody were mandatory. There purpose of the statute governing placement of prisoners placed in community confinement for the last six months of his/her sentence without regard to inlaid regulations. The Courts have ordered the BOP to immediately consider the inmate for transfer to a CCC in good faith and without reference to the 2002 and 2005 policies. Although the BOP is not required to consider an inmate transfer at any particular time - other than its duty to provide appropriate prerelease conditions pursuant to section 18 USC 3624(c) - it may not rely on its invalid regulations for guidance.

The Courts' decision in the Fults case did NOT specify or limit the application of the BOP policy to a particular facility. It stated that the BOP in general will return to its old policy. It is not a geographic location, but BOP in totality. It is unreasonable to allow the BOP to apply the exact same policy in different ways in different geographic locations. This has resulted in one group of FEDERAL prisoners that is housed in the 2nd, 3rd, and 8th districts being able to benefit from their Circuit Courts' interpretation while the remaining federal prison population is subject to a more narrow interpretation. I challenge the validity of the BOP's partial implementation of the court ordered return to PS 7310.04.

PS 7310.04
12/16/98
Page 5

restricted to the CCC.   An inmate shall ordinarily be placed in the Community Corrections Component upon arrival at the CCC.

This orientation period normally lasts for two weeks or until the inmate has demonstrated to CCC staff the responsibility necessary to function in the community.  Based on their professional judgment, CCC staff shall determine when an inmate is prepared to advance to the Prerelease Component.

(2)   The Prerelease Component is designed to assist inmates making the transition from an institution setting to the community.  These inmates have more access to the community and family members through weekend and evening passes.

b.   Community Corrections Programs.  In addition to a CCC's traditional services, the Bureau also has the following community-based programs.  Referral procedures may be described in independent Bureau directives issuances.  The Community Corrections Manager (CCM) reviews the inmate's characteristics and the recommendations noted in the referral package to determine if one of the following programs (if available) may be more appropriate than traditional CCC placement.

(1)   Comprehensive Sanctions Center (CSC).  The CSC concept, initiated by the Bureau, with the extensive cooperation and teamwork of U.S. Probation and CCC contractors, was developed to provide courts with a wider range of sentencing options and to facilitate the development and implementation of community program plans tailored to the individual needs of prerelease inmates.

The CSC is designed to meet the needs of higher risk prerelease inmates and consists of six different levels of supervision, ranging from 24-hour confinement to Home Confinement.

It also may have an intensive treatment component consisting of substance abuse education and treatment, life skills training, mental health counseling, education, employment assistance, and mentoring.  The inmate's progress is systematically reviewed by a Program Review Team (PRT), consisting of representatives from the Bureau, U.S. Probation, and the CCC.

(2)   Mothers and Infants Together (MINT).  MINT is an alternative residential program that promotes bonding and parenting skills for low risk female inmates who are pregnant.  The inmate is placed in the program two months prior to delivery and remains there for three months after delivery.

(3)   Home Confinement.  Home Confinement is a generic term used to cover all circumstances in which an inmate is required to remain at home during non-working hours of the day.  Electronic

PS 7310.04
12/16/98
Page 6

monitoring equipment is sometimes used to monitor compliance with the program's conditions. These programs provide an opportunity for inmates to assume increasing levels of responsibility, while, at the same time, providing sufficient restrictions to promote community safety and convey the sanctioning value of the sentence.

Home Confinement provides an option for inmates who do not need the structure of a residential facility. Except for inmates who are initially sentenced to and graduate from the Intensive Confinement Center Program, statutory provisions limit the length of Home Confinement to the last 10% of the sentence, or six months, whichever is less. Inmates are required to pay subsistence of 25% of their gross income to defray the costs of Home Confinement and electronic monitoring.

The Bureau is involved in two Home Confinement programs. Home Confinement operates from the Bureau's own network of CCCs and the U.S. Probation Division program.

(a)  CCC Contractors. The first form of Home Confinement is CCC contractor-operated programs. In these programs, CCC staff monitor the inmate. Currently, only a few of these programs use electronic monitoring equipment. Supervision is provided by daily telephone contacts and periodic personal contacts in the home and workplace.

(b)  U.S. Probation Office. The second form of Home Confinement involves placing federal inmates in programs operated by the U.S. Probation Office. These programs use electronic monitoring equipment with U.S. Probation Officers (USPO) providing supervision.

(4)  Transitional Services Program (TSP). The community-based transition phase of the Bureau's Residential Drug Treatment Program is designed to complement the accomplishments and continue the institutional program's treatment plan. It reinforces the inmate's personal responsibility to lead a drug-free lifestyle through personal accountability for choices, confrontation of negative thinking patterns, and instruction in basic social skills. Inmates who successfully complete the Residential Drug Treatment Program's institutional phase should normally be considered for the maximum 180 day period of CCC placement, if they are otherwise eligible.

I Never have had a drug or alcholic problem in my whole entire Life.

W LIBRARY
OT REM

P.S. 7320.01
September 6, 1995
Page 7

ealing with minor infractions of program rules and with major violations that could result in the inmate's termination from the program.  The provider must report every violation to the CCM within 24 hours.

10.  MODIFICATION OF PROGRAM REQUIREMENTS.  Attachment B specifies the required frequency and nature of contacts required between the provider and the inmate.

After consultation with the provider and the USPO, the CCM, using sound correctional judgement, may permit modification to these requirements, based on the unique characteristics of each case. The CCM is encouraged to discuss potential modifications with the Management Center Administrator (MCA) and/or the CCRA.

Among the circumstances under which the CCM may typically consider modification are those where:

- distance or travel time make it impractical for staff and the inmate to travel; and/or

- the inmate has successfully demonstrated the ability and willingness to conform to all program requirements for a reasonable period (ordinarily two weeks minimum).

In any case, however, unless continuously signalling electronic monitors are used, the home confinement monitor must initiate telephone contact with the inmate no less than once each day at random times of the day.

11.  PLACEMENT ON HOME CONFINEMENT FOLLOWING CCC PLACEMENT.  CCCs provide transition services for inmates being released from institutions.  When an inmate has employment and a place to live and has demonstrated that he/she no longer requires the level of accountability and services the CCC provides, the inmate may be placed on home confinement.  For various reasons, some inmates may never progress to a level of responsibility which would warrant placement on home confinement.

12.  PROCEDURES FOR DIRECT INMATE PLACEMENT ON HOME CONFINEMENT. If there is a electronically monitored program available, an inmate who does not require CCC transitional services may be placed directly on home confinement from an institution.

   a.  Eligibility.  Generally, an inmate may be considered eligible for direct placement on home confinement if he or she:

   ✓ has no public safety factors,
   ✓ had excellent institutional adjustment,
   ✓ has a stable residence with a supportive family,
   ✓ has confirmed employment (if employable), and
   ✓ has little or no need for the services of a CCC.

HOME